NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

BRETT STEVEN STEMPEL, *Appellant.*

No. 1 CA-CR 24-0682

FILED 07-24-2026

---

Appeal from the Superior Court in Maricopa County
No. CR2020-146335-001
The Honorable Justin Beresky, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph A. Newberg, II
*Counsel for Appellee*

Koplow Law Firm, Phoenix
By Lawrence S. Koplow
*Co-Counsel for Appellant*

Law Offices of John Penner, Scottsdale
By John Penner
*Co-Counsel for Appellant*

Law Offices of Rhonda Neff, PLLC, Phoenix
By Rhonda Elaine Neff
*Co-Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Samuel A. Thumma delivered the decision of the Court, in which Judge Andrew J. Becke and Judge Kent E. Cattani joined.

---

**T H U M M A**, Judge:

¶1        Defendant Brett Steven Stempel appeals his convictions and resulting sentences for second-degree murder and endangerment. Stempel argues that, because he was denied the right to counsel, under the exclusionary rule, the superior court was required to either dismiss the charges or suppress blood draw evidence. He also argues he was improperly precluded from collecting his own independent evidence, that the person who collected a second blood draw was not properly identified and that PTSD evidence he sought to offer should have been admitted. Because Stempel has shown no error, his convictions and sentences are affirmed.

**FACTS[1] AND PROCEDURAL HISTORY**

¶2        At about 2:15 p.m. one day in November 2020, Stempel was driving north on Third Street in Phoenix, approaching McDowell Road. Driving far faster than the speed limit, Stempel ran a red light and hit a car driven by the first victim. The force of that collision caused the first victim's car to hit a car driven by the second victim. The first victim later died from resulting injuries; the second victim was not injured. Stempel was seriously

---

[1] This court reviews the trial evidence in a light most favorable to sustaining the verdicts. *See State v. Karr*, 221 Ariz. 319, 320 ¶ 2 (App. 2008) (citing cases).

2

injured, including fracturing a hip, and was taken to the hospital, accompanied by Phoenix Police Officer Sabu.

¶3 Two witnesses at the scene, including the driver of the second vehicle, said they could smell alcohol on Stempel. First responders reported that Stempel was slurring his speech. Other witnesses saw Stempel run the red light.

¶4 The speed limit was 35 miles per hour. Data from Stempel's car showed he was driving more than 75 miles per hour a few seconds before the crash, and 60 miles per hour a tenth of a second before the crash. Trial testimony confirmed that the first victim's car had been hit by another vehicle at a high rate of speed.

¶5 Stempel arrived at the hospital at about 2:25 p.m. Soon after, hospital staff drew Stempel's blood for medical purposes and without law enforcement involvement. Testing later showed a blood alcohol content (BAC) of 0.336 for that first draw.

¶6 When Officer Sabu attempted to speak with Stempel at 2:53 p.m., Stempel responded: "I think I need to talk to a lawyer." Officer Sabu then ended the conversation, reported on his police radio that Stempel had slurred speech and watched as Stempel received medical care. Officer Sabu later testified he did not ask for Stempel's consent to a blood draw, citing concerns about Stempel's capacity to consent at that time given medication he was receiving.

¶7 Officer Sabu later obtained a search warrant for a blood draw. Officer Sabu submitted the search warrant request at about 4:30 p.m., and the warrant issued at about 4:38 p.m. Officers served Stempel with the warrant at 5:32 p.m. and the second blood draw was taken two minutes later. Detective Tow was present during that second blood draw. Testing later showed a BAC of 0.274 for that second blood draw.

¶8 Stempel was arrested at about 7:40 p.m., and charged with one count of second-degree murder, a Class 1 dangerous felony, and one count of endangerment, a Class 6 dangerous felony. The murder charge alleged Stempel "recklessly engaged in conduct which created a grave risk of death and thereby did cause the death" of the first victim. The endangerment charge alleged Stempel "recklessly did endanger" the second victim "with a substantial risk of imminent death." Stempel filed a variety of pretrial motions, five of which (numbered for ease of reference) are relevant here.

¶9 In September 2022, Stempel moved: (1) to dismiss/suppress evidence, arguing the State interfered with his right to counsel and gather exculpatory evidence and (2) to suppress the evidence or in the alternative conduct an evidentiary hearing, claiming the search warrant was invalid as it was not supported by probable cause. The State countered that, because Stempel was not in custody, there was no violation of his right to counsel or to gather exculpatory evidence, and that the search warrant was supported by probable cause.

¶10 Officer Sabu testified at a two-day pretrial evidentiary hearing ending in January 2023. He testified that, upon arriving at the scene, another officer told him that Stempel was "possibly impaired." Officer Sabu further testified that, before obtaining the search warrant, he contacted other officers who spoke with the accident witnesses to substantiate the warrant.

¶11 In his probable cause statement submitted with the search warrant request, Officer Sabu noted his "direct observations of slurred speech" before any medication was provided to Stempel, and "put in the witness statements obtained by officers on scene as to the speed of Mr. Stempel's vehicle at the time. And also the vehicle had not stopped for a red light, and then caused a collision."

¶12 In February 2023, Stempel filed additional motions, seeking: (3) to suppress all evidence obtained after what the motion called "a de facto arrest which was not supported by probable cause;" (4) to suppress evidence obtained by the warrant, arguing the warrant knowingly included "materially false and misleading" information and (5) to dismiss "due to the government's failure to provide an independent test advisory as required by Arizona law." After the State filed oppositions, the court held oral argument on all five of Stempel's motions and took them under advisement.

¶13 In April 2023, the court denied Stempel's motions. Concluding Stempel was not in custody, and the police did not interfere with his right to counsel, the court denied motion 1, seeking to dismiss/suppress evidence. The court denied motions 2 and 4, addressing the validity of the search warrant, noting the search warrant and affidavit demonstrated probable cause for the search warrant. In doing so, the court noted that the affidavit included a potential unintentional error (the affiant checking a Drug Recognition Expert box, even though the affiant was not such an expert) and an omission (not stating Stempel may have struck his head on the windshield of his car during the crash). But, the court added,

even accounting for those issues, the affidavit still showed probable cause. Noting the exclusionary rule, the court concluded the affidavit "was not so factually deficient that a magistrate would be misled or that officers would not be able to presume that the warrant was valid."

¶14 Considering all the circumstances surrounding the encounter, and concluding Stempel was not in police custody at the time challenged, the court denied motion 3, claiming de facto arrest. The court also denied motion 5, seeking dismissal for failure to allow independent testing. In doing so, the court applied the rationale set forth in *State v. Kemp*, 168 Ariz. 334, 335 (1991), which noted that blood testing does not consume the entire sample, meaning samples from the two blood draws remained for Stempel to conduct independent testing.

¶15 In May 2024, Stempel moved to reconsider, arguing that newly discovered evidence showed Officer Sabu asked medical providers not to contact Stempel's family. Stempel's motion asked the court to reconsider its denial of Stempel's "constitutional challenges," including the motion to dismiss and/or suppress the blood test results. After further discovery, briefing, and oral argument, in August 2024, the court issued a lengthy minute entry denying the relief requested in Stempel's motion to reconsider.

¶16 The court's ruling noted newly discovered evidence that Officer Sabu asked a hospital social worker to not contact Stempel's family members and that Stempel "was considered in police custody and that the police would contact any family members as needed." Based on that newly discovered evidence, the court concluded that a reasonable person in Stempel's position "would believe they were not free to leave or terminate the encounter" with the police, and that Stempel showed a violation of his right to counsel when the police officers did nothing to assist or facilitate his desire to speak with counsel.

¶17 Applying *State v. Rosengren*, 199 Ariz. 112 (App. 2000) and *State v. Rumsey*, 225 Ariz. 374 (App. 2010), analogous manslaughter cases, the superior court found that the violation of the right to counsel did not foreclose a fair trial. In *Rosengren*, the defendant, who was driving a car that crashed killing the passenger, was charged with manslaughter. 199 Ariz. at 114-15 ¶¶ 1-2. Rosengren was taken to the hospital, where police officers declined his request to call his father, who was a lawyer. *Id.* at 115 ¶ 4. Officers observed Rosengren at the scene and after he invoked his right to silence, field sobriety tests were not performed, but officers video- and audio-recorded the investigation. *Id.* at ¶ 3. Given indications of alcohol

impairment, a blood draw pursuant to a warrant was taken, which apparently reflected impairment. *Id.* at 115 ¶ 6. Alleging a violation of his right to counsel, Rosengren moved to dismiss the charge. *Id.* at 115 ¶ 7. After an evidentiary hearing, the superior court denied the motion to dismiss but suppressed evidence of the results of the blood testing. *Id.*

**¶18** On appeal, it was undisputed that "police 'acted improperly' and intentionally violated Rosengren's right to counsel by not honoring his request to speak with his father, an attorney." *Id.* at 116 ¶ 10. Noting Rosengren was not prevented from collecting exculpatory evidence or undertaking independent testing, the court rejected his argument that dismissal was required. *Id.* at 118-19 ¶ 19. Ultimately, the court affirmed, concluding "[t]he trial court did not abuse its discretion in fashioning an appropriate remedy for the violation of Rosengren's rights." *Id.* at 122 ¶ 35 (citations omitted).

**¶19** In *Rumsey*, the defendant, who was driving a car that hit two bicycle riders, killing one, was charged with manslaughter and other offenses. 225 Ariz. at 376 ¶¶ 2-3. Field sobriety tests at the scene showed signs of impairment. *Id.* While at the scene, Rumsey spoke with her attorney, who then traveled to the accident scene. *Id.* at 377 ¶ 5. The attorney then got delayed, and took a wrong turn following Rumsey to the police station. *Id.* Police then took three separate blood draws pursuant to a warrant, which apparently showed impairment. *Id.* at 376-77 ¶¶ 3, 6. Alleging a violation of her right to counsel, Rumsey moved to suppress her statements during the initial blood draw and the results of all three blood tests. *Id.* at ¶ 7. The superior court denied the motion. *Id.* at 381 ¶ 23.

**¶20** On appeal, the court affirmed the finding that Rumsey's right to counsel was violated. *Id.* at 378 ¶ 12. In addressing the appropriate remedy, the court rejected Rumsey's argument that dismissal of the charges or suppression of the impairment-related evidence was required. *Id.*; *Id.* at 381 ¶ 22. Noting Rumsey did not argue the violation "deprived her of any exculpatory evidence such that a fair trial was impossible, the trial court correctly concluded that dismissal" was not required. *Id.* at 378 ¶ 15 (citation omitted). After discussing *Rosengren*, *Rumsey* concluded that "there was no nexus between the deprivation of Rumsey's right to counsel and the lawfully obtained blood evidence Rumsey sought to suppress," meaning the court did not err in denying her motion to suppress. *Id.* at 381 ¶ 22.

**¶21** Applying these and other cases, the superior court noted Stempel was not prevented from collecting exculpatory evidence. The court

concluded that dismissal of the charges was not appropriate. As to suppression, the court noted the second blood draw was taken pursuant to a valid warrant. The court stated the issue fell somewhere between *Rosengren*, where blood testing results were suppressed under the exclusionary rule, 199 Ariz. at 121-22 ¶ 30, and *Rumsey*, where blood testing results were not suppressed, 225 Ariz. at 381 ¶ 22, finding this case was more similar to *Rumsey*. Concluding "there was no nexus between the deprivation of [Stempel's] right to counsel and the lawfully obtained blood evidence pursuant to the warrant," the court denied Stempel's motion to suppress. The court later denied his motion to reconsider.

**¶22**        In August 2024, Stempel disclosed his intent to call Dr. Sarah Gallimore to testify that he met the criteria for PTSD. The State moved to preclude that testimony, arguing evidence of PTSD was "not relevant and constitutes an impermissible diminished capacity defense." During oral argument, the court noted that Dr. Gallimore was being offered "to present evidence that [Stempel] couldn't have been aware of the recklessness of his conduct based on his diagnosis of PTSD." The court precluded the testimony, concluding it was "improper, because you're essentially using it to negate the mens rea."

**¶23**        During an eight-day jury trial in September 2024, the State presented testimony from witnesses to the crash as well as Officer Sabu and Detective Tow. The jury heard evidence that the first blood draw showed a BAC of 0.336, while the second blood draw taken hours later showed a BAC of 0.274.[2] After the court denied Stempel's motion for judgment of acquittal, he called forensic toxicologist Chester Flaxmayer, who testified about the legitimacy of the blood draws. After deliberating, the jury found Stempel guilty as charged.

**¶24**        Stempel was sentenced to 17 years in prison for second-degree murder, and incarcerated for 70 days for the endangerment conviction, to run concurrently, with the court awarding 70 days of presentence incarceration credit. This court has jurisdiction over Stempel's timely appeal pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. sections 12-120.21(A)(1), 13-4031 and 13-4033(A).

---

[2] As points of reference, for driving under the influence (DUI) charges (which are not at issue here), the BAC levels for both of Stempel's blood draws far exceed the legal limit. *See* Ariz. Rev. Stat. (A.R.S.) §§ 28-1381(A)(2) (0.08 for DUI); -1382(A)(1) (0.15 for extreme DUI).

## DISCUSSION

### I.  Stempel Has Not Shown the Superior Court Erred in Admitting Evidence Resulting from the Blood Draws.

¶25 A separate opinion rejects Stempel's arguments that admission of the blood draw evidence was structural error and that this court reviews de novo a superior court's order considering possible remedies for a violation of the exclusionary rule. *See* Ariz. R. Crim. P. 31.19(f); Ariz. R. Sup. Ct. 111(h). Applying that standard in this memorandum decision, Stempel has shown no error.

### A.  Neither Dismissal nor Suppression Was Mandated.

#### 1.  Dismissal as a Remedy.

¶26 Stempel argues "the court refused to provide any remedy" when it concluded "there was no nexus between the violation" of his right to counsel and the blood draw evidence, which Stempel argues was "plain error." Stempel argues that if "*Rumsey* represents delayed consultation and *Rosengren* represents constrained consultation, this case represents the complete absence of consultation." Thus, he argues, the superior court was required to dismiss the charges.

¶27 Dismissal of charges with prejudice is the most drastic remedy possible. *See State v. Pecard*, 196 Ariz. 371, 379 ¶ 42 (App. 1999) (referring to "the drastic remedy of dismissal"). Rejecting that drastic remedy, the superior court found this case was analogous to *Rosengren*, concluding that, although there was a violation of the right to counsel, Stempel "had or has the opportunity to collect exculpatory evidence." *See Rosengren*, 199 Ariz. at 118 ¶ 19 ("[I]n determining whether dismissal is required, the pertinent cases primarily have focused on whether the violation of right to counsel has 'foreclosed a fair trial by preventing [the defendant] from collecting exculpatory evidence no longer available.'") (citing cases).

¶28 The superior court found that Stempel had access to (1) "an abundance of body cam recordings of [Stempel's] physical and mental condition at the time of the collision;" (2) an ability to subpoena "numerous non-police medical personnel" who examined him "to testify as to the lack of any signs or symptoms of impairment;" and (3) "access to the blood evidence that was taken pursuant to the search warrant for independent testing." Stempel has not shown that the superior court incorrectly assessed the evidence available to him, particularly given that the charges here were

for murder and endangerment, not DUI. Stempel has not shown the superior court abused its discretion in denying his motion to dismiss the charges. *See Rosengren*, 199 Ariz. at 118 ¶ 17 ("[A] violation of the right to counsel and the concomitant due process right to gather independent evidence of sobriety requires outright dismissal only if evidence of intoxication is essential to the prosecution of the offense.") (citing cases).

### 2. Suppression as a Remedy.

¶29　　　　Stempel argues that "[s]uppression was the minimum remedy required." Although seeking to distinguish *Rumsey* and *Rosengren* on their facts, he fails to show that the analysis in those cases does not apply. Both cases affirmed rulings addressing the proper consequences for the denial of a right to counsel. *See Rumsey*, 225 Ariz. at 376 ¶ 1; *Rosengren*, 199 Ariz. at 305-06 ¶ 1. Here, the superior court reasonably found the blood-related evidence, including the second draw obtained pursuant to a warrant, was sufficiently attenuated from the denial of Stempel's right to counsel.　Thus, as in *Rumsey*, suppression was not appropriate. *See* 225 Ariz. at 378-79 ¶ 13 (citing cases).

¶30　　　　The exclusionary rule does not always result in the suppression of evidence. *See State v. Mitcham*, 258 Ariz. 432, 441 ¶ 33 (2024) (the exclusionary rule is applied only "where its deterrence benefits outweigh its 'substantial social costs.'") (citing cases). Indeed, "suppression is not required unless a nexus exists between the violation and the evidence obtained." *Rumsey*, 225 Ariz. at 379-80 ¶ 16 (citation omitted). Evidence need not be suppressed when "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'" *Id.* at 378 ¶ 13 (citation omitted).

¶31　　　　Here, in addressing the motion to suppress, the superior court required a nexus between the violation and the evidence obtained. In doing so, the court properly noted that, in cases where suppression was ordered, the defendant had requested and was denied counsel *before* deciding to give a blood sample voluntarily. In *Rumsey*, where evidence was not suppressed, the basis for obtaining a warrant to secure a blood draw was unrelated to the violation of the right to counsel. *Id.* at 381 ¶ 22 ("In short, there was no nexus between the deprivation of Rumsey's right to counsel and the lawfully obtained blood evidence Rumsey sought to suppress."). The superior court properly found that was the case here.

¶32　　　　Stempel admits that the first blood draw was taken at about 2:25 p.m., "for medical purposes soon after his arrival in the trauma unit."

Stempel concedes that he did not request a lawyer until nearly half an hour later. This timeline properly allowed the superior court to conclude that there was no nexus between the deprivation of his right to counsel and the first blood draw, which showed a BAC of 0.336 less than an hour after the crash.

¶33 Officer Sabu testified that "he never intended to seek [Stempel's] consent to a blood draw" because he thought Stempel lacked capacity to consent given the medical treatment and pain medication being administered. Officer Sabu's body worn camera recording confirms his testimony. Officer Sabu testified that, "after [Stempel] was administered medications, he was in a state of euphoria. He couldn't comprehend it."

¶34 Because Stempel was never asked to consent to a blood draw, there was no nexus between the deprivation of Stempel's right to counsel and the blood evidence obtained pursuant to the warrant. The record shows that, in seeking a warrant for the second blood draw, Officer Sabu detailed his "direct observations of slurred speech by Mr. Stempel; prior to administration of any medication. And I also put in the witness statements obtained by officers on scene as to the speed of Mr. Stempel's vehicle at the time. And also the vehicle had not stopped for a red light, and then caused a collision." Stempel has shown no abuse of discretion in the superior court addressing these facts and has shown no error in the denial of his motion to suppress.

### B. The Superior Court Did Not Err in Concluding Stempel's Ability to Obtain Independent Evidence Was Not Violated.

¶35 Stempel asserts that the police "did not inform him of his right to obtain independent testing," which "cut off his only chance to gather exculpatory evidence." Stempel argues he was "entitled to an independent blood draw because the government's samples may be unreliable." "Without access to an independent and representative sample," Stempel adds, "the defense had no adequate way to counter the [BAC] numbers the jury saw." Stempel asserts that the lack of corroborating evidence of intoxication amplifies this defect.

¶36 Stempel correctly asserts that "a DUI suspect has a due process right to gather independent evidence of sobriety while it still exists." *See State v. Nevarez*, 235 Ariz. 129, 136 ¶ 20 (App. 2014) (citing cases); *McNutt v. Superior Court*, 133 Ariz. 7, 10 n.2 (1982). Consistent with that right, the State "may not unreasonably interfere with an accused's reasonable attempts to secure, at his own expense, a blood or other scientific

test." *Smith v. Cada*, 114 Ariz. 510, 514 (App. 1977). This, however, is not a DUI case; Stempel was charged with and convicted of second-degree murder and endangerment. But even in DUI cases, the defendant may seek to secure, at the defendant's own expense, "a blood or other scientific test for the purpose of attempting to establish evidence of his sobriety at or near the crucial time under consideration." *Nevarez*, 235 Ariz. at 136 ¶ 20 (citation omitted). There is no affirmative duty on law enforcement to advise the suspect of that right, at least (as here) where the sample taken by law enforcement would still be available for independent testing by the defendant. *See State v. Olcan*, 204 Ariz. 181, 184 ¶ 12 (App. 2003); *Kemp*, 168 Ariz. at 335.

¶37 Recognizing that the appropriate remedy for the denial of such rights could include dismissal or suppression, *State v. Penney*, 229 Ariz. 32, 36 ¶ 17 (App. 2012), the superior court rejected dismissal as a proper remedy because there was no evidence that any of the police officers interfered with Stempel's ability to obtain exculpatory evidence. Moreover, because there was no nexus between a denial of counsel and Stempel's ability to gather evidence, the superior court also rejected suppression as a proper remedy. Stempel has shown no abuse of discretion in those conclusions.

### C. The Superior Court Correctly Qualified the Person Taking the Second Blood Draw and Stempel Failed to Rebut that Showing.

¶38 Stempel argues that the State never identified the woman who conducted his second blood draw. He argues "[t]he only thing the jury knew about her was that she wore a shirt labeled 'paramedic in training.' No one could say who she was, what training she had, or whether she met any forensic standards." Stempel contends this violated *State v. Nihiser*, 191 Ariz. 199 (App. 1997), because the "government may not use forensic blood evidence without first identifying the person who drew the blood and proving the individual was qualified under Arizona law."

¶39 By statute,

only a physician, a registered nurse or another qualified person may withdraw blood for the purpose of determining the alcohol concentration or drug content in the blood. The qualifications of the individual withdrawing the blood and the method used to withdraw the

blood are not foundational prerequisites for the admissibility of a blood alcohol content determination made pursuant to this subsection.

A.R.S. § 28-1388(A); *see also State ex rel. Pennartz v. Olcavage*, 200 Ariz. 582, 588 ¶ 20 (App. 2001) ("[A] person is 'qualified' to draw blood for DUI purposes if he or she is competent, by reason of training or experience, in that procedure."). If the State presents evidence that a qualified person drew the blood, the statute's foundational requirement is met. *See Nihiser*, 191 Ariz. at 202. "Once this foundational showing is made, the individual's qualifications and the validity of the method used are presumed." *Id.* at 203. A defendant is then required "to present evidence that the individual who drew the blood was not qualified or the blood was drawn improperly to rebut the statutory presumptions that the samples were drawn by a qualified person in a reliable manner." *Id.*

¶40 Here, the State offered evidence showing the foundational requirement for the second blood draw. Detective Tow testified that "the hospital phlebotomist" did that blood draw. A body worn camera recording was presented to the jury, and Detective Tow confirmed the person that drew the blood was someone with a t-shirt that said, "Paramedic Student." Detective Tow added: "I didn't look at any certifications or anything prior to, but I saw that she was a hospital member drawing blood on a patient. I would assume that anyone in the hospital drawing blood on patients would be someone who's qualified to do so."

¶41 When asked if the person was a hospital employee, Detective Tow testified she was, adding that the Detective "got an employee number" for the phlebotomist and "asked her about it after and got her information." Detective Tow then explained what happened during the second blood draw, using the body worn camera recording. The court concluded that the evidence established that "Detective Tow was present there during the blood draw" and was essentially "overseeing the blood draw," there was "testimony that the hospital doesn't allow people to do blood draws that aren't qualified," the "blood draw was done in the emergency room of a hospital," and, as a result, the State had made the required foundational showing.[3] Stempel made no attempt to counter that showing.

---

[3] Although Stempel argued in superior court he had a right to confront the person who drew the blood, he has not made that argument on appeal, meaning it is waived. *See State v. Lopez*, 223 Ariz. 238, 240 ¶ 6 (App. 2009).

¶42 Because the State offered sufficient evidence to show the statutory foundational requirements, and Stempel did not rebut that showing, he has shown no error regarding the qualifications of the person who took the second blood draw. *See Nihiser*, 191 Ariz. at 203-04 (finding no error in admitting blood test results when there was testimony indicating the person who drew the blood was hospital staff and no evidence was offered by the defendant to rebut the showing).

## II. The Superior Court Properly Excluded the PTSD Evidence Stempel Sought to Offer as Diminished Capacity Evidence.

¶43 Both charges against Stempel allowed for a conviction based on reckless conduct. The second-degree murder charge alleged Stempel "without premeditation . . . recklessly engaged in conduct which created a grave risk of death and thereby did cause the death" of the first victim. The endangerment charge alleged Stempel "recklessly did endanger" the second victim "with a substantial risk of imminent death."

¶44 The statutory definition for the mental state of "recklessly" concludes with the following limitation: "A person who creates such a risk but who is unaware of such risk *solely* by reason of voluntary intoxication also acts recklessly with respect to such risk." A.R.S. § 13-105(10)(c) (emphasis added). Stempel argues that "[i]f even one other factor, such as PTSD, contributed to a defendant's unawareness, the Government has not proven recklessness." Accordingly, he asserts the superior court erred in excluding his proffer of Dr. Gallimore's testimony of his claimed PTSD to show that he did not act recklessly. Stempel adds that "here, where the jury had to distinguish among criminal negligence, recklessness, and extreme indifference, the need to consider PTSD related evidence was not peripheral but elemental." He claims error because the superior court "barred *all* PTSD-related evidence by mischaracterizing Dr. Gallimore's proposed testimony as impermissible capacity evidence."

¶45 This court reviews the superior court's preclusion of Dr. Gallimore's PTSD testimony for an abuse of discretion. *State v. Malone*, 247 Ariz. 29, 31 ¶ 7 (2019). "Using mental disease or defect evidence to refute the mens rea element of a crime is commonly referred to as 'diminished capacity' or 'diminished responsibility' defense." *Id.* at 31 ¶ 9 (citations omitted). Arizona does not recognize diminished capacity or responsibility defenses, and evidence of them is prohibited. *Id.* at 31 ¶¶ 8-9.

¶46 In responding to the State's objection to Dr. Gallimore's testimony, Stempel stated that he was "trying to present evidence that

shows there were other factors that led to [Stempel] being unaware, in addition to voluntary intoxication, and the word 'solely' is informative." Stempel argued if a defendant was 99 percent unaware of a risk due to voluntary intoxication and one percent due to PTSD, the State could not prove guilt beyond a reasonable doubt. The superior court stated it thought "the word 'solely' was put in there simply to take away a defense of, I can't be responsible because I was impaired." Noting that "nowhere else in the criminal code does it exist where you'd be allowed to argue this to negate the mens rea without doing a [guilty except insane] defense," the court rejected Stempel's argument and precluded Dr. Gallimore's proposed testimony.

¶47            During trial, Stempel provided an offer of proof stating that, if allowed to testify, Dr. Gallimore would testify that Stempel "met the criteria for PTSD at the time of the accident;" "has severe PTSD" with "a comorbidity of binge drinking;" "[t]hat it would not be surprising if Stempel was unable to recognize risky behaviors even without the use of alcohol;" that his PTSD "causes him to be unable to recognize the consequence of his actions;" and that "Stempel's psychological condition was one factor in his inability to perceive risk at the time of the accident." The offer of proof also stated Stempel had "significant risk factors for PTSD," including, among other things, a "personal history of substance abuse" and the factors along with PTSD "commonly cause failure to perceive risk."

¶48            On appeal, Stempel argues Dr. Gallimore "was offered solely to provide clinical observations about [Stempel's] symptoms, and risk factors, along with general information about PTSD and its comorbidities." Although "a defendant may present 'observational evidence' about the defendant's 'tendency to think in a certain way and his behavior characteristics,'" *State v. Jacobson*, 244 Ariz. 187, 192 ¶ 18 (App. 2017), the superior court found the potential testimony was not offered for this purpose, but for the improper purpose of negating mens rea, *see, e.g.*, *State v. Buot*, 232 Ariz. 432, 436 ¶ 20 (App. 2013) ("[A] defendant charged with second-degree murder may not offer evidence that due to a character trait of impulsivity, he did not act knowingly or recklessly because he lacked the power to control his actions."). The offer of proof focused on the thought that Stempel's PTSD, and related psychological condition, was one factor in his inability to perceive risk at the time of the crash. This is improper diminished capacity evidence. *See Malone*, 247 Ariz. at 34 ¶ 20 ("Although behavioral-tendency evidence is permissible to negate mens rea, linking that behavior to a mental disease or defect, whether directly or under the guise of corroboration, is impermissible.") (citing cases). On this record,

Stempel has shown no error in this characterization of Dr. Gallimore's diminished capacity evidence and, accordingly, has shown no abuse of discretion in the court precluding that testimony.

## CONCLUSION

**¶49**        Stempel's convictions and resulting sentences are affirmed.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:          JR